IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| **TAMPA BAY WATER,** | MDL No. 2:18-mn-2873-RMG |
| **Plaintiff,** | This Document Relates To: |
| **v.** | **Case No. 2:20-cv-1867-RMG** |
| **E.I. DUPONT DE NEMOURS AND COMPANY; DUPONT DE NEMOURS, INC. (F/K/A DOWDUPONT, INC.); CORTEVA, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); DYNEON LLC; KIDDE-FENWAL, INC.; ANGUS FIRE; THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT CO.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; TYCO FIRE PRODUCTS LP; TYCO INTERNATIONAL, PLC; JOHNSON CONTROLS INTERNATIONAL, PLC; JOHN DOE DEFENDANTS 1-50,** | **COMPLAINT** **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Tampa Bay Water ("Plaintiff") files this Complaint against the Defendants E.I. DuPont de Nemours and Company, DuPont de Nemours, Inc. (f/k/a DowDuPont), Corteva, Inc., The Chemours Company, The Chemours Company FC, LLC, The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), Dyneon LLC, Kidde-Fenwal, Inc., Angus Fire, The Ansul Company, Buckeye Fire Equipment Co., Chemguard, Inc., National Foam, Inc., Tyco Fire

1

Products, LP, Tyco International PLC, Johnson Controls International PLC, and John Doe Defendants 1-50 (collectively "Defendants"), and in support thereof alleges as follows:

## SUMMARY OF THE CASE

1.      Plaintiff brings this action for damages, contribution and reimbursement of costs incurred, and which continue to be incurred, to address the presence of Polyfluoroalkyl substances or "PFAS" chemicals[1] found in the water supply system of Plaintiff.  As the manufacturers and sellers of products that contain PFAS compounds, Defendants, have discharged PFAS into, or are otherwise responsible for PFAS released into, the waters and environment that serve as the supply sources for Plaintiff's public water supply systems.

2.      For years, Defendants manufactured, sold, and distributed PFAS compounds and products containing PFAS chemicals used in a firefighting suppressant agent, concentrate, solution, or foam known as Aqueous Film Forming Foam ("AFFF") that contains PFAS compounds or that break down into PFAS compounds. AFFF is used primarily at airports, in firefighting locations, military facilities, and other places in the Tampa, Florida area.

3.      Defendants knew, or should have known, that PFAS and related constituents in Defendants' products and by-products present unreasonable risks to human health, water quality, and the environment and of the dangers associated with these compounds.  Yet, Defendants handled, discharged, and were otherwise responsible for the release of PFAS into the environment without sufficient containment, caution, warning, testing, or alternative feasible products or components.  Defendants' acts and omissions resulted in the presence of PFAS in the water sources

---

[1] As used throughout this Complaint, "PFAS" includes but is not limited to Perfluorooctanoic acid ("PFOA"), Perfluorooctanesulfonic acid ("PFOS"), Perfluorohexanoic acid ("PFHxA"), Perfluoropentanoic acid ("PFPA"), Perfluoroheptanoic acid ("PFHpA"), Pentafluorobenzoic acid ("PFBA"), Perfluorobutanesulfonic acid ("PFBS"), Perfluorononanoic acid ("PFNA") , Perfluorodecacanoic acid ("PFDA"), and Perfluorohexane Sulfonic Acid ("PFHS").

of Plaintiff's public supply well systems.  As a result of the occurrence of PFAS in the environment from Defendants' products, Plaintiff has been and will be required to fund and implement capital costs, and has and will in the future incur ongoing operation and maintenance costs, in order to remove and treat for the presence of PFAS in the public water supply, and has incurred and will incur monetary damages and losses.

4.     With regard to the Defendants' tortious and wrongful conduct herein alleged, the Defendants used the U.S. mail, interstate wires, federal and state judicial systems, regulatory filings and testimony, and other vehicles to promote, conceal, protect, and continue their tortious and wrongful conduct over many, many years.

## JURISDICTION, VENUE, AND PARTIES

5.     This Court has subject matter jurisdiction under federal diversity, pursuant to 28 U.S.C. § 1332, as the citizenship of the Plaintiff is completely diverse from the citizenship of the Defendants, and the amount-in-controversy exceeds $75,000.

6.     Plaintiff brings this civil action directly in *In Re: Aqueous Film-Forming Foams Products Liability Litigation*, Multi-District Litigation ("MDL") No. 2873.  Plaintiff files directly in this venue, the United States District Court for the District of South Carolina, Charleston Division, as allowed under the provisions of Paragraphs 25-29 of this Court's Case Management Order No. 3, dated April 26, 2019 (Doc. # 72).  Plaintiff designates the United States District Court for the Middle District of Florida, Tampa Division, as its "Home Venue" under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in that District.  But for this Court's Order permitting direct filing in this MDL, Plaintiff would have filed in its Home Venue.

3

7.      Plaintiff, Tampa Bay Water, is a Florida entity, a regional wholesale drinking water utility that serves customers in the Tampa Bay, Florida region. A board of directors composed of commissioners from member counties and cities governs the Plaintiff.  The Plaintiff provides water to over 2.5 million citizens. Tampa Bay Water, formerly the West Coast Regional Water Supply Authority, was created in 1998 to deliver drinking water in an environmentally sound, cost-effective and reliable manner. To achieve these goals, Tampa Bay Water draws from a diversified water supply system to reduce dependence on a sole source — groundwater. Among its sources of drinking water, Plaintiff relies on surface water from rivers, streams, and canals and groundwater from regional well fields.

8.      Defendant E.I. DuPont de Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  DuPont does  business throughout the United States, including in this District. DuPont manufactured, marketed, promoted, distributed, and/or sold products or compounds containing PFOA and/or PFOS or which degraded into PFOA and/or PFOS, that were used in AFFF. Specifically, DuPont was a founding member of the Fire Fighting Foam Coalition and through its active participation in this Coalition, DuPont marketed and sold its fluorosurfactants containing PFAS to AFFF manufacturers, and DuPont suppressed, concealed, and diluted the truth, information, and data that it knew about the dangers of PFAS and its products over a very long time, all to the detriment of the Plaintiff.

9.      Defendants The Chemours Company and The Chemours Company FC, LLC are Delaware corporations with their principal places of business in Wilmington, Delaware. These Defendants are collectively referred to as "Chemours" or "the Chemours Defendants" and do business throughout the United States, including in this District. In 2015, DuPont spun off its "performance chemicals" business, including its fluoroproduct divisions and business, to

Chemours. The fluoroproducts and chemical solutions businesses appear to have been transferred to both The Chemours Company and the Chemours Company FC, LLC. The Chemours Company was incorporated as a subsidiary of DuPont until approximately April of 2015, and The Chemours Company FC, LLC was formed as a subsidiary around the same time. In approximately July of 2015, Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business and began operating as an independent company. As part of this spinoff Chemours assumed certain environmental liabilities associated with DuPont's historical business lines, including those related to PFOA/PFOS. DuPont and Chemours, as alleged in detail below, fraudulently conveyed the assets and liabilities of DuPont in this spinoff. Chemours has filed a complaint against DuPont in the Delaware Chancery Court seeking declaratory relief related to the allocation of various environmental liabilities. DuPont's creation of Chemours was for the purpose, in part or whole, of shielding DuPont and/or Chemours of certain liabilities and claims related to PFAS.

10.    Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business in Wilmington, Delaware. Corteva does business throughout the United States, including in this District. Corteva was formed through a series of transactions initiated by the merger of DuPont and the Dow Chemical Company ("Dow") in August of 2017, which formed DowDuPont, Inc ("DowDuPont"). DuPont and Dow each became subsidiaries of DowDuPont. Corteva was formed as a subsidiary of DowDuPont in 2018, and in approximately June 2019, DowDuPont spun off its agricultural business to Corteva. Corteva is the parent of DuPont, holds all of DuPont's outstanding stock, and holds some of DowDuPont's assets and liabilities, including its agricultural and nutritional businesses, which in turn likely include business lines and liabilities relating to PFAS manufacture, marketing, distribution, and/or sale. Corteva's creation is for the

purpose, in part or whole, of attempting to avoid PFAS liabilities and claims.

11.     Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont) ("New DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. New DuPont does business in the United States, including in New York and in this District. DowDuPont became New DuPont following the Corteva spinoff. New DuPont holds assets in the specialty products businesses, and the remainder of the financial assets and liabilities that DuPont held after the aforementioned spinoffs. Presumably, these assets and liabilities are valued at billions of dollars and are related to DuPont's historic PFAS manufacture, marketing, distribution, and/or sale. The creation of the New DuPont is for the purpose, in part or whole, of attempting to avoid PFAS claims and liabilities.

12.     Defendants DuPont, New DuPont, the Chemours Defendants, and Corteva are collectively referred to herein as the "DuPont Defendants." The DuPont Defendants manufactured PFAS-containing compounds for manufacture and use in AFFF products for sale and use throughout the United States, including Tampa, Florida.

13.     Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation, with its principal place of business located at 3M Center, St. Paul, Minnesota 55133.

14.     Through at least 2002, 3M manufactured PFOS for use in AFFF and other products, and it manufactured AFFF that contained PFAS compounds for sale and use throughout the United States, including Tampa, Florida.

15.     Defendant Dyneon LLC ("Dyneon") is a subsidiary of 3M and is a Delaware corporation with its principal place of business in Oakdale, Minnesota. Dyneon does business throughout the United States, including in this District, and in various other countries.  At all

relevant times, Dyneon manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at various military bases, airports, and other locations throughout the United States, including the Tampa, Florida area.

16.     Defendant The Ansul Company (hereinafter "Ansul") is a Wisconsin corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

17.     At all times relevant, Ansul manufactured fire suppression products, including AFFF that contained PFAS compounds, including a firefighting foam product named TARGET-7. Ansul initially used fluorosurfactant from Ciba-Geigy (Lodyne S-112) for Ansul's fluoro-telomerization process to manufacture AFFF. Ansul's foam was known as Ansulite or AnsulAFFF. Ansulite 3x3 was marketed as the first alcohol-resistant AFFF capable of being used on both hydrocarbon and polar solvent fuels at a 3% concentration. Additional suppliers of fluorosurfactants to Tyco/Ansul include Dynax, Chemguard, and Atochem. Tyco/Ansul's AFFF does not contain perfluorooctane sulfonate ("PFOS") due to its telomerization process but did contain perfluorooctanoic acid ("PFOA"). Ansul's AFFF products were first sold to the U.S. Government in 1976.

18.     The Ansul Company, founded in 1912, started conducting firefighting training programs in 1940 at Ansul's headquarters in Marinette, Wisconsin. Ansul changed its name over the years: from 1915 to 1963, it was Ansul Chemical Company, then from 1963 to 1981, the Ansul Company, and from 1981 to 1995, Ansul Fire Protection. In 1978, Ansul was acquired by Wormald International, an Australian company in the fire protection business since 1889. Tyco International, Ltd. purchased Wormald International in 1990. While Tyco sold much of Wormald to Evergreen Capital LLC in 2015, Tyco kept Ansul. Ansul now exists as a brand of Tyco Fire (*infra*), and a business "segment" of Tyco International, PLC ("Tyco") and more recently Johnson Controls

International, PLC ("JCI"). The Ansul name today is marketed by Tyco and/or JCI as a premium brand line of products.

19.     Tyco and Ansul's headquarters in Marinette, Wisconsin has been ranked among the dirtiest and worst facilities in the United States for cancer risk due to air and water releases.  Ansul polluted the nearby Menominee River in Marinette, Wisconsin with heavy contamination of arsenic compounds released from 1957 to 1977. For many years, Tyco operated under orders with the Wisconsin Department of Natural Resources (Consent Order 2A-73-714) and the EPA.

20.     Chemguard, Inc. ("Chemguard") is a foreign corporation, having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143.  Tyco International acquired Chemguard in 2011. Chemguard moved its corporate headquarters to Marinette, Wisconsin, moving in with Ansul, following Tyco's acquisition.

21.     The Chemguard name continues to be used as a brand name in Tyco Fire, Tyco, and JCI. Chemguard's explained the realignment as follows: "When Tyco acquired the Chemguard brand in 2011, we planned to make use of the joint best practices, industry knowledge, and production synergies that come with integrating two businesses." From the press release announcing the Chemguard acquisition, Tyco declared: "We're excited about the Chemguard acquisition, which broadens our global portfolio of firefighting foam products and services . . . . Chemguard's expertise in firefighting foam chemistry and applications will enhance our R&D efforts and enable us to speed our time to market with innovative products and services."

22.     At all times relevant, Chemguard manufactured fire suppression products, including AFFF that contained PFAS compounds. Chemguard makes both 3% and 6 fluorotelomer-based AFFF. Chemguard's AFFF was first sold to the U.S. Government in 1998. Chemguard also manufactured and sold its own fluorosurfactants to other AFFF manufacturers,

including Defendant National Foam, Inc). Chemguard purchased other fluorosurfactants from Ciba-Geigy (Lodyne), Dynax, Chemours (Capstone), and Atochem n/k/a Archema.

23.    Tyco Fire Products, L.P. ("Tyco Fire") is a limited partnership with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco Fire is a subsidiary of Tyco and JCI. Founded in 1960, Tyco was formed as an investment and holding company, focused primarily on governmental research and military experiments in the private sector. In the 1980s, Tyco reorganized along broad categories of business segments, one of the being Tyco Fire. In July 1997, Tyco merged by reverse takeover with the smaller, publicly-traded company, ADT Limited. Tyco International Ltd. of Massachusetts became a wholly-owned subsidiary of ADT Limited, and simultaneously ADT changed its name to Tyco International Ltd., retaining the Tyco stock symbol, TYC, on the NYSE. The merger moved Tyco's incorporation to Bermuda. In 2002, Tyco formed its wholly-owned subsidiary, SimplexGrinnell LP, the World's largest fire protection company. Tyco later sold off a number of its units, including its Capital division, and then in 2007 split into three separate companies: Coviden, TE Connectivity, and Tyco International Ltd. f/k/a Tyco Fire & Security and Tyco Engineered Products & Services. In 2012, Tyco again split into three separate companies: Tyco Fire, ADT, and Flow Control (acquired by Pentair, which was later acquired by Emerson Electric). At some point, Tyco became Tyco International PLC, an Ireland company, with its subsidiary Tyco International (US) Inc. and operational headquarters in Princeton, New Jersey. Tyco merged into Johnson in 2016, with Johnson being the renamed parent company and assuming Tyco's PLC structure in Ireland. Tyco's CEO, George R. Oliver, who had previously been the CEO of Tyco Fire, became the CEO of the merged entity.  At all pertinent times and for all allegations in this Complaint, Tyco Fire, Ansul, and/or Chemguard were and/or are controlled by Tyco or JCI.

24.    Ansul, Chemguard, and Tyco Fire manufactured AFFF-containing PFAS or PFAS by-products for sale and use throughout the United States, including Tampa, Florida.

25.    Tyco International, PLC is or was an alien entity that has U.S. headquarters in Wisconsin and that conducted business in the State of Florida.

26.    JCI is an alien entity that has U.S. headquarters in Wisconsin with business conducted throughout the State of Florida.

27.    National Foam, Inc. (a/k/a Chubb National Foam) (National Foam, Inc. and Chubb National Foam are collectively referred to as "National Foam") is a Pennsylvania corporation, with its principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.

28.    At all times relevant, National Foam manufactured fire suppression products, including AFFF that contained PFAS compounds for sale and use throughout the United States, including Tampa, Florida.

29.    Defendant Angus Fire ("Angus") is part of Angus International, and has corporate headquarters in Bentham, United Kingdom.  Angus Fire maintains a place of business in the United States at 141 Junny Road, Angier, North Carolina 27501. At all times relevant, Angus manufactured fire suppression products, including AFFF that contained PFAS compounds for sale and use throughout the United States, including Tampa, Florida.

30.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. At all times relevant, Buckeye manufactured fire suppression products, including AFFF that contained PFAS compounds for sale and use throughout the United States, including Tampa, Florida.

31.    Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business in Ashland, Massachusetts. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde does business throughout the United States, including conducting business in Florida. Kidde manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances for sale and use throughout the United States, including Tampa, Florida.

32.    Upon information and belief, Defendants John Does 1-50 also manufactured and sold products that contain PFAS compounds.  Plaintiff presently lacks information sufficient to specifically identify the names of Defendants sued herein under the fictitious names DOES 1 through 50.  Plaintiff will amend this Complaint to show their true names if and when they are ascertained.

33.    All Defendants have committed the tortious acts alleged herein within the State of Florida, specifically in the Tampa, Florida area.

## POLYFLUOROALKYL SUBSTANCES

34.    PFAS compounds are a family of manmade chemicals, also known as perfluorochemicals ("PFCs"), which have been created and used for decades to make products that resist heat, oil, stains, grease, and water.

35.    In the 1940s and 1950s, 3M began creating PFAS chemicals and compounds and incorporating them into certain of their products.  3M not only used PFAS chemicals in its own products but also sold them to other companies for use in AFFF.

36.    AFFFs were introduced commercially into U.S. environment in the mid-1960s, becoming the primary firefighting foam in the United States and other parts of the World. AFFF

is water-based and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

37.     AFFFs are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, the resulting solution has the characteristics needed to produce an aqueous film that spreads across the surface of a hydrocarbon fuel. It is this film formation feature that provides fire extinguishment and is the source of the designation, aqueous film forming foam or AFFF.

38.     AFFFs contain PFAS in their concentrate and formulation and/or as known or foreseeable by-products when the AFFFs are released into the environment.

39.     Once PFASs enter the environment, they are extremely persistent and resistant to typical environmental degradation processes.  In addition, PFASs are thermally stable synthetic organic contaminants, are carcinogenic, and cause ill effects to human, animal, and aquatic life. PFASs also have high water solubility (mobility), low biodegradation (persistence), and high bio-accumulation in humans, animals, and aquatic life.

40.     PFASs, in particular PFOS and PFOA, have been identified as "emerging contaminants" by the United States Environmental Protection Agency ("EPA").  This term describes contaminants about which the scientific community, regulatory agencies, and the general public have a new and increasing awareness or understanding about how they affect the environment or public health.

41.     PFASs, like other emerging contaminants, have become the focus of active research and study, which means that new information is released periodically regarding the effects on the environment and human health as a result of exposure to the chemicals.

42.    Certain PFAS compounds, such as PFOS and PFOA (also known as "C8" because it contains eight carbon compounds), have been the focus of the many state regulatory authorities and the EPA, as well as environmental interest groups.

43.    EPA studies, as well as studies conducted and/or paid for by DuPont and 3M, have indicated that exposure to PFOA and PFOS over certain levels can result in adverse health effects, including but not limited to developmental effects to fetuses during pregnancy or to breastfed infants (*e.g.*, low birth weight, accelerated puberty, skeletal variations), cancer (*e.g.*, testicular, kidney, pancreatic), liver effects (*e.g.*, tissue damage), immune effects (*e.g.*, antibody production and immunity), thyroid effects, and other effects (*e.g.*, cholesterol changes).

44.    In January of 2009, the EPA established a drinking water Provisional Health Advisory Level ("HAL") for PFOA and PFOS, the two PFAS compounds about which it had the most toxicological data. EPA set the Provisional HAL at 0.4 parts per billion (ppb) for PFOA and 0.2 ppb for PFOS.

45.    In May 2016, EPA issued new HALs for PFOA and PFOS, identifying 0.07 ppb (or 70 parts per trillion (ppt)) as the concentration of PFOA or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure.

46.    In issuing its 2016 HALs, EPA directed that when both PFOA and PFOS are found in drinking water, the *combined* concentrations of PFOA and PFOS should be compared with 70 ppt health advisory level.

47.    In connection with its emerging contaminant studies, EPA implemented an Unregulated Contaminant Monitoring Rule Number 3 in 2012 ("UCMR 3"), which was designed to collect nationwide information regarding the occurrence of PFAS contamination in the public's water supply.

48.    UCMR 3 required sampling of Public Water Systems ("PWSs") serving more than 10,000 people (i.e., large systems) and 800 representative PWSs serving 10,000 or fewer people (i.e., small systems) for 21 chemicals, including a number of PFASs, during one consecutive twelve-month period in the timeframe between 2013 through 2015.

49.    Sampling under UCMR 3 used higher reporting limits than would be applicable in light of scientific information and guidance levels developed since that time, which are much lower than those employed in 2008 and 2009.

50.    In addition, the UCMR 3 sampling effort did not combine PFAS levels, thus not taking into account added effects from the presence of more than one PFAS compound as ILEPA has recognized is appropriate.

51.    While more studies have been conducted, and thus, more is known regarding PFOS and PFOA, all PFAS compounds have generally demonstrated similar characteristics to PFOS and PFOA.

52.    Although some PFAS compounds have been shown to break down, the resulting products typically end at non-biodegradable PFOA and PFOS.

53.    The EPA acknowledges that the studies associated with PFAS compounds are ongoing, and as such, the HALs may be adjusted based upon new information. In EPA's February 2020 "PFAS Action Plan: Program Update," the agency included information on a newly approved laboratory method – Drinking Water Method 533 – for testing and detecting PFAS in drinking water. This new method will allow for more effective measurement of PFAS in drinking water. EPA also announced that it plans to provide for further monitoring of PFAS in the next UCMR sampling cycle.

14

54.     Additionally, in a significant step to tighten the federal health-based standards, the EPA announced it was gathering the information on PFOA, PFOS, and other PFAS substances necessary to begin the process of establishing a national primary drinking water regulation for PFOA and PFOS.

55.     As manufacturers, sellers, handlers and dischargers of PFAS compounds, and products containing PFAS, Defendants knew or should have known that the inclusion of PFAS chemicals in any products presented an unreasonable risk to human health and the environment.

56.     Defendants knew or should have known at the time they put their AFFF products into use and into the environment that PFAS compounds are highly soluble in water, highly mobile, toxic, extremely persistent, bio-accumulative, and highly likely to contaminate water supplies if released to the environment.

57.     Defendants' actual and/or constructive knowledge of the adverse impacts from PFAS compounds to human health and the environment amounts to reckless disregard to human health and environmental safety. Nonetheless, Defendants negligently and recklessly manufactured and sold PFAS and products containing PFAS with no warnings or instructions on use or disposal to avoid contamination.

58.     Motivated by billions of dollars in profits, the DuPont Defendants and 3M have intentionally withheld, suppressed, minimalized, diminished, marginalized, misrepresented, and obfuscated factual information in their possession regarding the toxic effects of PFASs on the environment, animal health, aquatic life, and human health.

59.     Defendants, or some of them, applied for and received various patents regarding their AFFF products over many years, including alternative feasible products such as fluorine-free foam concentrates.

60.    Defendants' actions have directly resulted in the contamination of Plaintiff's water supply. Because Defendants' PFAS has infiltrated the waters that serve as the sources for Plaintiff's public water supply systems, this contamination is recurring and continuing.

**ILLEGAL TRANSFERS BETWEEN THE DUPONT DEFENDANTS**

61.    In approximately 2014, DuPont formed Chemours as its subsidiary company. At that time, Chemours apparently had a board of directors, but that board was controlled by DuPont.

62.    In July of 2015, DuPont transferred its "performance chemicals" business to The Chemours Company. Around the same time, The Chemours Company FC, LLC was formed as a subsidiary of The Chemours Company. The transfer of the "performance chemicals" business included fluoroproducts, and chemical solutions. The fluoroproducts and chemical solutions transfers appear to have been made to The Chemours Company and the Chemours Company FC, LLC (again, collectively "Chemours").

63.    In addition to the transfer of these business lines, Chemours assumed various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities assumed by Chemours are not publicly available.[2]

64.    The DuPont-Chemours transfer included incredible amounts of debt and multiple failing product lines. Significantly, DuPont pinned on Chemours its historic (and future) environmental liabilities, which were known by DuPont to be massive. Chemours did not receive a reasonably equivalent value in exchange for this transfer or obligation. Likewise, the assets transferred to Chemours were unreasonably small in relation to the business or transaction. DuPont

---

[2] For instance, various of The Chemours Company's and Dupont's public filings indicate that both The Chemours Company and the Chemours Company FC, LLC were transferred assets that include fluoroproducts and chemical solutions business lines.

knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

65.     At the time of the DuPont-Chemours transfer, the DuPont performance chemicals business held an estimated debt of approximately $4 billion.

66.     At that same time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

67.     Per the Separation Agreement governing the DuPont-Chemours transfer, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from DuPont's performance chemicals business, with no time limitation. This indemnification remains uncapped. Chemours also agreed to indemnify DuPont against and assume for itself the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

68.     Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement or action relating to the environmental liabilities it assumed.

69.     At the time of the DuPont-Chemours spinoff in 2015, DuPont was fully aware  of its potential liabilities related to PFAS contamination throughout the United States.

70.     After the spinoff, new members of the Chemours board were appointed. The spinoff and related decisions were conducted while DuPont controlled the board. The new Chemours

board did not take part in the separation.

71.    DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and its litigation-related liabilities have been increasing since at least the early 2000's. For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act related to its PFAS compounds. Although seemingly small, this was the largest such PFC-related penalty in history at the time it was levied.

72.    Relatedly and also in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia relating to its Washington Works facility in Parkersburg, West Virginia, which had caused thousands of people to receive serious medical diagnoses, including cancer, attributable to DuPont's PFAS pollution of the environment, including drinking water supplies.

73.    In 2016, Chemours acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

74.    Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the Ohio claims. Chemours and DuPont each additionally agreed to pay $25 million annually for future PFOA-related costs not covered by the settlement for the following five years.

75.    At the time of the DuPont-Chemours spinoff, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours'

assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other performance chemicals, such as benzene.

76.    The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spinoff with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liabilities, including for the claims that arise out of this case, which has and will further harm Plaintiff.

77.    DuPont has continued its plan to avoid PFAS liabilities more recently, and in similar methods to the Chemours maneuvers, by creating Corteva, Dow-DuPont, and the New DuPont.

## PLAINTIFF WATER PROVIDER

78.    Plaintiff is committed to the supply of potable drinking water consistent with federal and state guidelines and requirements. Plaintiff desires to deliver the best possible quality of drinking water without any of Defendants' contaminants in the raw or finished water.

79.    As a result of Defendants' PFAS contamination of certain and various water sources with AFFF products and by-products, Plaintiff has incurred, and will continue to incur, significant costs, for ongoing measures, monitoring, capital improvements, and operational expenses that reduce and/or remove PFAS contamination from the raw water sources in order to provide quality finished drinking water for consumers in the Tampa, Florida area.

19

## COUNT ONE – STRICT LIABILITY AGAINST ALL DEFENDANTS

80.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

81.    Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals and products containing PFAS, either as a necessary component of their products or a foreseeable and/or known by-product(s) which Defendants knew or should have known, would result in contamination of the environment, including the waters that serve as the water source for Plaintiff's public water supply system, thereby causing damage to Plaintiff.

82.    Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds would have on the environment and the activities and rights of others.

83.    Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, and the foreseeable risk that their PFAS-containing products and by-products would be discharged, released, or disposed of in the environment.

84.    By causing PFAS contamination and the resulting impact to Plaintiff's public water supply systems, Defendants engaged in abnormally dangerous activity for which they are strictly liable.

85.    As a result of Defendants' abnormally dangerous activity, Plaintiff has incurred, and will continue to incur, investigation, cleanup, remediation, and removal costs and damages related to PFAS contamination.

## COUNT TWO – STRICT LIABILITY (FAILURE TO WARN)<br>AGAINST ALL DEFENDANTS

86.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

20

87.     Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals, products, and by-products containing PFAS, which Defendants knew or should have known, would result in contamination of the environment, including the waters that serve as the water source for Plaintiff's public water supply systems, thereby causing damage to Plaintiff.

88.     Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds, chemicals, products, and by-products would have on the environment and the activities and rights of the Plaintiff and others.

89.     Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, the bio-accumulation of PFAS in humans, animals, and aquatic life, and the foreseeable risk that their PFAS and PFAS-containing products would be discharged, released, or disposed of in the environment.

90.     Defendants should have known the chemical ingredients and formulas of their products, and the by-products of their products once they entered the environment.

91.     Defendants failed to provide warnings or instructions sufficient to notify the users and/or the public and/or the Plaintiff of the dangers inherent in Defendants' products and by-products.

92.     Defendants' failure to provide proper and adequate notice or instruction regarding the dangers of their products and by-products to human health and the environment rendered Defendants' PFAS-containing products and PFAS by-products unreasonably dangerous for the purposes intended and promoted by Defendants.

93.     Defendants' duty to warn is and was a non-delegable duty.

94.     The DuPont Defendants and 3M also intentionally, recklessly, and without regard for human life and the environment covered up, suppressed, withheld, obfuscated, minimized, and

otherwise misrepresented the facts they had with regard to the PFAS chemicals, compounds, products, and by-products as such relate to the persistence and high mobility of PFAS in the environment, the bio-accumulation of PFAS in humans, animals, and aquatic life, and the environmental fate and transport. The DuPont Defendants and 3M not only failed to warn the public and the Plaintiff of same, but, at various times, failed to warn certain manufacturers and sellers of AFFF, including some of the Defendants in this civil action.

95.    This failure to warn or adequately instruct regarding the dangers associated with use of Defendants' products directly and proximately caused harm and damages to Plaintiff.

96.    The failure to warn and deceptive conduct of the DuPont Defendants and 3M, as to the public, the Plaintiff, and certain manufacturers and sellers of AFFF including some of the Defendants in this civil action, constitutes reprehensible, outrageous, and fraudulent conduct, justifying an award of punitive damages as against the DuPont Defendants and/or 3M for failure to warn.

## COUNT THREE – STRICT LIABILITY (DESIGN DEFECT) AGAINST ALL DEFENDANTS

97.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

98.    Defendants herein, at all times relevant, were in the business of the design, manufacture, sale and distribution of PFAS-containing products, chemicals, and compounds, and/or the foregoing use of which created PFAS in the environment as part of the foreseeable use of AFFF products.

99.    Defendants designed, manufactured, marketed, and sold defective products that were unreasonably dangerous for their intended use. The AFFF manufacturing Defendants either

knew of the dangers contained in their AFFF products or chose to ignore the chemicals, compounds, and by-products of their AFFF products.

100.    When Defendants placed their PFAS-containing AFFF products into the stream of commerce, the products were defective, unreasonably dangerous, and not fit, suitable, or safe for the intended, foreseeable, and ordinary uses.

101.    The products designed, manufactured, sold, and distributed by Defendants reached consumers and users without substantial change to the condition and nature of the products. The Defendants made their AFFF products pursuant to their own formulas, research, design specifications, and testing.

102.    Defendants, with knowledge of the risks associated with the use of PFAS compounds, failed to use reasonable care in the design of PFASs.

103.    The defects in Defendants' products existed at the time the product left Defendants' control and were known to Defendants.

104.    Reasonable safer alternatives exist and were available to Defendants at all relevant times.  In fact, many of the Defendants patented feasible alternative products. Thus, the risks of Defendants' products outweighed the benefits.

105.    The defects in Defendants' products proximately caused and have directly resulted in the damages of which Plaintiff complains.

## COUNT FOUR – NEGLIGENCE AGAINST ALL DEFENDANTS

106.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

107.    Defendants had a duty to exercise due or reasonable care in the manufacture, distribution, and use of its PFAS chemicals and PFAS-containing products so as to avoid harm to

those who would be foreseeably injured by PFAS environmental contamination.

108.    Defendants knew or should have known that their PFAS products would result in the release, discharge, or disposal of PFAS compounds into the environment that would lead to contamination of drinking water supplies and hazards to human health if not treated.

109.    By failing to exercise due care in the design, manufacturing, marketing, testing, promotion, and environmental sampling of their PFAS compounds and/or their PFAS-containing AFFF products, Defendants breached their duty to avoid harm to Plaintiff.

110.    The DuPont Defendants and 3M negligently failed to share, publish, or otherwise expose their internal testing, employee health information, fate and transport studies, and knowledge of the adverse effect of their products on human, animal, and aquatic life. The DuPont Defendants and 3M also intentionally, recklessly, and without regard for human life and the environment covered up, suppressed, withheld, obfuscated, minimized, and otherwise misrepresented the facts they had with regard to the PFAS chemicals, compounds, products, and by-products as such relate to the persistence and high mobility of PFAS in the environment, the bio-accumulation of PFAS in humans, animals, and aquatic life, and the environmental fate and transport. The DuPont Defendants and 3M not only negligently failed to inform the public and the Plaintiff of same, but, at various times, failed to warn certain manufacturers and sellers of AFFF, including some of the Defendants in this civil action. The failure to warn and deceptive conduct of the DuPont Defendants and 3M, as to the public, the Plaintiff, and certain manufacturers and sellers of AFFF including some of the Defendants in this civil action, constitutes reprehensible, outrageous, and fraudulent conduct, justifying an award of punitive damages as against the DuPont Defendants and/or 3M for failure to warn.

111.    As a result of Defendants' negligence, Plaintiff has incurred, and will continue to incur, investigation, cleanup, remediation, abatement, and removal costs and damages related to PFAS contamination.

112.    Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of Plaintiff.

113.    As a direct and proximate result of Defendants' actions and omissions, Plaintiff has suffered and continues to suffer damages.

### COUNT FIVE – PRIVATE NUISANCE AGAINST ALL DEFENDANTS

114.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

115.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has physically invaded Plaintiff's water supply, and unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its public water supply systems and the water sources that supply those systems.

116.    The private nuisance created by Defendants is continuing.

117.    Defendants have failed, and continue to fail, to abate the private nuisance.

118.    As a result of the private nuisance, Plaintiff has suffered and continues to suffer, significant harm and damages, including investigation, cleanup, remediation, and removal costs and damages related to the detection, treatment and removal of PFAS constituents that have and will continue to migrate into Plaintiff's water supplies.

### COUNT SIX – PUBLIC NUISANCE AGAINST ALL DEFENDANTS

119.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

120.    Through Defendants' acts and omissions, Defendants' AFFF and PFAS-containing AFFF products and their by-products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to a clean environment, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

121.    Through Defendants' acts and omissions, Defendants' AFFF and PFAS-containing products and by-products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to the use of waters that serve as a source of potable water, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

122.    The public nuisance created by Defendants is continuing.

123.    Defendants have failed, and continue to fail, to abate the public nuisance.

124.    The DuPont Defendants and 3M, in other places in the United States, have paid hundreds of millions of dollars to settle civil lawsuits in attempts to remedy public water supplies and the persons directly affected adversely from drinking water in those other places. Despite this, the Plaintiff expects that the DuPont Defendants and 3M in this civil action will deny that they engaged in these very same wrongful activities and conduct in Tampa, Florida. The DuPont Defendants and 3M have made such baseless denials in other lawsuits filed by other water providers to date.

125.    As a result of the public nuisance, Plaintiff has suffered and continues to suffer, significant harm and damages special to Plaintiff and different in kind from those the general

public may have suffered, including investigation, cleanup, remediation, and removal costs and damages related to the detection, treatment and removal of PFAS constituents that have and will continue to migrate into Plaintiff's water supplies such that Defendants should be required by injunction to abate the nuisances they have created.

## COUNT SEVEN – FRAUDULENT CONVEYANCE VIOLATIONS AGAINST THE DUPONT DEFENDANTS

126.    Plaintiff realleges and reaffirms each and every allegation set forth in the foregoing paragraphs as if fully stated herein.

127.    Plaintiff seeks all relief available under the Florida Uniform Fraudulent Transfer Act for the Dupont Defendants' violations of the Florida UFTA, Fla. Stat. § 726.101 *et seq.* for their fraudulent conveyances as part of their various spinoff transactions.

128.    The DuPont Defendants engaged in acts in furtherance of a scheme to transfer DuPont's assets so that parties in PFAS litigation, such as Plaintiff, could not obtain funds or collect a judgment which they are or will be owed. As a result of the DuPont Defendants' acts, omissions, and other conduct described herein, Plaintiff has been damaged.

129.    At all relevant times, the DuPont Defendants have (1) acted with actual intent to hinder, delay, and defraud parties; (2) acted without receiving a reasonably equivalent value in exchange for the transfer obligation arising out of the DuPont-Chemours spinoff; and/or (3) were engaged or were about to engage in a business for which the remaining assets of Chemours  were unreasonably small in relation to the business or that the business intended to incur, or those liabilities the DuPont Defendants believed or reasonably should have believed that Chemours would incur.

130.    For decades, DuPont manufactured, marketed, distributed, and/or sold PFAS chemicals or compounds for use in AFFF and/or that the DuPont Defendants knew would create PFAS by-products when AFFF was used for its intended purpose, with the DuPont Defendants having superior knowledge that they were toxic, mobile, persistent, bio-accumulative, and biomagnifying, and through normal and foreseeable use, would impact groundwater, Plaintiff's water supplies, and other natural resources.

131.    As a result of the transfer of assets and liabilities described herein, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from their manufacture, marketing, distribution, and/or sale of compounds or chemicals for use in AFFF products.

132.    At the time of the transfer of its performance chemical business to Chemours, DuPont had been sued, had notice of suits, and/or had knowledge of likely litigation regarding DuPont's liability from the manufacture, marketing, distribution, and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

133.    The DuPont Defendants acted without receiving consideration and/or a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay when those debts became due.

134.    The claims, judgment, and potential judgments against Chemours potentially exceed its ability to pay. Accordingly, Plaintiff seeks avoidance of the transfer of DuPont's liabilities for the claims brought herein and seeks to hold the DuPont Defendants liable for any

damages or other remedies that may be awarded by the Court or jury arising from this Complaint. Plaintiff further seeks all other rights and remedies that may be available to it, including prejudgment remedies as available under applicable law, as may be necessary for full compensation of damages and injuries Plaintiff has suffered as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff TAMPA BAY WATER respectfully requests that this Court:

A. Enter judgment finding Defendants jointly and severally liable for all costs and damages incurred by Plaintiff, including but not limited to prior, interim and future capital as well as operation and maintenance costs related to PFAS contamination; including the reasonable costs of sampling, investigations, and assessment of injury, and destruction or loss resulting from PFAS contamination;

B. Enter judgment finding Defendants jointly and severally liable for cleanup and removal costs and damages, including but not limited to prior, interim and future capital as well as operation and maintenance costs, including the reasonable costs of assessing injury, destruction or loss resulting from the discharges, and threatened discharges;

C. Enter judgment finding Defendants liable for punitive damages;

D. Enter judgment finding Defendants liable for consequential damages;

E. Enter judgment requiring, via injunction, Defendants to abate the nuisance they have created;

F. Award Plaintiff costs and reasonable attorney fees incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

G. Award Plaintiff such other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Demand is hereby made for a trial by jury.

Attorneys for the Plaintiff

By:    */s/ T. Roe Frazer II*
T. Roe Frazer II
Thomas Roe Frazer III
**FRAZER PLC**
30 Burton Hills Blvd, Suite 450
Nashville, Tennessee 37215
(615) 647-0990
roe@frazer.law
trey@frazer.law

*Of Counsel:*

**NAPOLI SHKOLNIK, PLLC**
Paul J. Napoli
Andrew W. Croner
360 Lexington Avenue, 11th Fl.
New York, New York 10017
(212) 397-1000
pnapoli@nsprlaw.com
acroner@napolilaw.com

**VENTURA LAW**
Agostinho Ribeiro
Nicole L. Barber
235 Main Street
Danbury, CT 06810
(202) 800-8000
augie@venturalaw.com
nicole@venturlaw.com

**FRANK CHARLES MIRANDA, P.A.**
Frank C. Miranda
3226 W. Cypress Street
Tampa, Florida 33607
(813) 254-2637
frank@fcmlaw.com

Dated: May 14, 2020.